**FILED**

2009 Sep-28  PM 04:17
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>*ex rel*. GLENDA SHACKLEFORD, )<br>MARYLIN PAYNE, and )<br>BELINDA BORDEN, )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>SERENITY PALLIATIVE )<br>AND HOSPICE CARE, INC., )<br>CARING HANDS HOSPICE, INC., )<br>METROPOLITAN HOSPICE, INC., )<br>SOUSAN BADII, )<br> )<br>Defendants. ) | Case No: _____<br><br>**FILED UNDER SEAL**<br>**DO NOT PLACE IN PRESS BOX**<br>**DO NOT ENTER ON PACER**<br><br>**DEMAND FOR JURY** |

### *QUI TAM* **COMPLAINT**

Plaintiff-Relators Glenda Shackleford, Marilyn Payne, and Belinda Borden, on behalf of themselves and the United States of America, allege and claim against Serenity Palliative and Hospice Care, Inc., Caring Hands Hospice, Inc., Metropolitan Hospice, Inc., and Sousan Badii, as follows:

## JURISDICTION AND VENUE

1.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act").  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.  Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

2.     Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendants qualify to do business in the State of Alabama, transact substantial business in the State of Alabama, transact substantial business in this judicial district, and can be found here.  Additionally, as herein described, Defendants committed within this judicial district acts proscribed by 31 U.S.C. § 3729.  Specifically, Defendants submitted and caused to be submitted in this judicial district false claims for payment for fraudulent hospice services and made or used false records to get such claims paid by the United States.

## PARTIES

3.     Defendant Sousan Badii (Badii) is a Georgia-based entrepreneur who owns and controls several hospice operations including:

(a)     Metropolitan Hospice, Inc. (Metropolitan), a Georgia-based for-profit hospice provider with service locations in 22 Georgia counties.

(b)     Serenity Hospice, Inc. (Serenity), a for-profit hospice operating in Alabama and Georgia by and through numerous subsidiaries.

2

(c)     Caring Hands Hospice, Inc. (Caring Hands), a not-for-profit hospice

established in 1992 in Tuscaloosa, Alabama.

In 2007, Badii established a Serenity location in Birmingham and acquired Caring

Hands through, upon information and belief, Metropolitan Hospice.

4.     Plaintiff-Relator Glenda Shackleford is a Certified Nursing Assistant

(CNA) with over 20 years of experience in the home health care and hospice fields.

In January, 2007, Ms. Shackleford was hired by Badii's agent Lisa Singleton

(Singleton) for a CNA position at – she believed – Serenity.   When Ms.

Shackleford reported to her position, however, she was tasked to work

indiscriminately at Serenity and Caring Hands, simultaneously.  As described more

fully *infra*, Ms. Shackleford became aware that the distinction was one of name

only; Ms. Shackleford discovered that Badii's organization shuffles patients

between the two by way of false documents and without patient consent in

whatever manner may result in greater profit for the organization.  In fact, Ms.

Shackleford quickly became aware that Badii's entire organization was built upon

fraud and forgery.  In order to get Serenity certified by Medicare and state-

licensing agencies, Badii and Singleton ordered Ms. Shackleford and other

employees to falsify employment records, certify inappropriate patients,

fraudulently misdiagnose expensive patients, back-date intake and revocation

documents, lie to State auditors about the relationship between Serenity and Caring

Hands, and fabricate, wholesale, thousands of documents – including physician orders, patient authorizations, hospice certifications, and patient care notes – designed to make it appear as though Serenity was a legitimate hospice organization when, in fact, it was and is not.  After reporting such problems to State regulators without result, Ms. Shackleford became exasperated. Finally, Ms. Shackelford came forward to file this lawsuit when the scheme became so callous and blatant that Singleton attempted to "dump" Ms. Shackleford's father – a Caring Hands patient – from the census in order to fraudulently avoid paying the high costs of end-of-life care and pressured Ms. Singleton to sign a fraudulent revocation form to effect the scheme.

5.      Plaintiff-Relator Marilyn Payne is a Registered Nurse (RN) and long-time hospice care-giver and nursing supervisor.      Like Plaintiff-Relator Shackleford, she was recruited to Badii's organization in 2007 by Singleton under false pretenses.  Although she believed she was employed by Serenity, she was instructed to work for – and fraudulently transfer patients between – both Serenity and Caring Hands.  She left the organization in February 2008 for health reasons. In her time with Serenity and Caring Hands, Ms. Payne witnessed countless instances of blatant fraud and grave issues implicating patient care.  Ms. Payne personally witnessed the routine, pervasive practice of fabricating documents of every sort, including patient consent forms and certifications of all kinds to

4

Medicare and State licensing agencies. She has been instructed, and has witnessed the instruction of all Defendants' RNs, in practices designed to boost profits and cut costs to the serious detriment of patient care and in knowing violation of Medicare regulations.

6.     Plaintiff-Relator Belinda Borden is an RN with almost 20 years of experience in the healthcare industry. She was hired as an RN at Caring Hands in late 2006 and has served in an administrative and care-giving capacity with the Serenity/Caring Hands organization since that time. Ms. Borden has direct, personal knowledge of the widespread, systematic fraud perpetrated by Defendants' through Badii, Singleton, and others. She is familiar with Defendants' well-established practices related to the fabrication of documents, the forgery of signatures, the inhuman disregard of patient welfare, and the evasion of multiple healthcare laws and regulations.

7.     Plaintiff-Relators' experiences have convinced them that Defendants' organization is founded upon fraud and deceit. At the very time Plaintiff-Relators communicated this information to undersigned counsel on September 9, 2009, employees at Serenity/Caring Hands were actively engaged in avoiding detection by State authorities through fabrication and concealment of documents; as State of Alabama auditors entered the business, some employees were instructed to distract the authorities while others bundled incriminating documents into garbage bags

and secreted them into trunks of waiting cars.   The blatant, calculated fraud Plaintiff-Relators have encountered and the accompanying horrific threat to patient well-being and safety cause Plaintiff-Relators to file this action as original source relators under the *qui tam* provisions of the False Claims Act.   Plaintiff-Relators have already disclosed this information to the United States Attorney for the Northern District of Alabama and to the Department of Health and Human Services, through undersigned counsel.   Contemporaneously with this filing, Plaintiff-Relators are serving upon the United States a written disclosure of the material evidence upon which this claim is based.

## THE MEDICARE HOSPICE BENEFIT IN GENERAL

8.   Defendants' practices represent an intrusion of greed into an institution founded upon philosophical, spiritual, and medical notions of charity and care-giving.   The impetus for the modern hospice movement in the United States is attributed to psychiatrist Dr. Elizabeth Kübler Ross, whose 1969 On Death and Dying is acknowledged to have altered modern perceptions about care for the terminally ill.   In the 1970s, U.S. hospices opened their doors as volunteer organizations dedicated to bringing comfort and humanity to terminal patients. Testifying in 1975 before the U.S. Senate Special Sub-committee on Aging, Kübler Ross stated: "We should not institutionalize people. We can give families more help with home care and visiting nurses, giving the families and the patients

the spiritual, emotional, and financial help in order to facilitate the final care at home." In 1982, Congress created a provisional Medicare Hospice Benefit, made permanent in 1986. By 1990, 800 hospice companies were caring for 76,491 patients, with an average length of stay of 48.4 days.

9.    From such humble altruistic roots, Hospice has become big business. Medicare hospice payments rose from $205 million in 1989 to $9.2 billion in 2006. In 2004, payments to Alabama hospice companies alone amounted to nearly a quarter of a billion dollars. In the 1998 article "Hospice Boom Is Giving Rise to New Fraud," the *New York Times* recognized that the hospice infrastructure "was never designed to handle the expanding network of nursing homes, hospices, assisted-care centers and other services popping up to serve the nation's growing aging population." Venture capitalists, entrepreneurs like Badii, and other investors have been quick to perceive that the Medicare Hospice Benefit represents a potentially unlimited stream of income for those who can obtain licensing and represent to be providing end-of-life care to eligible patients.

10.    Hospice covers a broad set of palliative services for qualified beneficiaries who have a life expectancy of six months or less as determined by their physician. Hospice is designed to provide pain relief, comfort, and emotional and spiritual support to patients with a terminal diagnosis. Qualified hospice patients may receive skilled nursing services, medication for pain and symptom

7

control, physical and occupational therapy, counseling, home health aide and homemaker services, short-term inpatient care, inpatient respite care, and other services for the palliation and management of the terminal illness. Qualified beneficiaries who elect the Medicare Hospice Benefit agree to forego curative treatment for their terminal condition.

11.     Through Medicare and Medicaid (indirectly through the States), the United States reimburses hospice providers for services to qualified beneficiaries on a *per diem* rate for each day a qualified beneficiary is enrolled. Medicare and/or Medicaid makes a daily payment, regardless of the amount of services provided on a given day and even on days when no services are provided. Payments are made according to a fee schedule that has four base payment amounts for the four different categories of care: routine home care (RHC), continuous home care (CHC), in-patient respite care (IRC), and general in-patient care (GIC).

12.     Unless a hospice company provides CHC, IRC, or GIC on any given day it is paid at the RHC rate. For any given patient, the type of care can vary throughout the hospice stay as the patient's needs change. The daily payment rates are intended to cover costs that hospice providers incur in furnishing services identified in patients' care plans for patients who have been determined by their physicians to be suffering a terminal illness.

## THE DEFENDANTS' FRAUDULENT SCHEMES TO FALSELY BILL THE UNITED STATES FOR HOSPICE CARE

13.　Defendants operate with a purpose of fraud and a complete disregard for patient well-being or compliance with Medicare regulations.　Indeed, Defendants actively and expressly seek to evade both regulation and detection. Instead, Defendants seek to maximize profits at the expense of patients and taxpayers and to conceal their blatant fraud utilizing every conceivable device.

### a.　Fraudulent Certifications and Back-Dated Admissions of Hospice Patients

14.　Defendants defraud the United States through the deliberate, fraudulent certification and admission of non-qualifying patients to hospice and the deliberate falsification of patient records to indicate admission dates – and thus claims for payment – far in advance of the true date of admission.

15.　At the time of the employment of Plaintiff-Relators by Serenity/Caring Hands, Serenity's Alabama location was not Medicare-licensed and had no patients.　Accordingly, Plaintiff-Relators and Serenity's other employees were dispatched to recruit and certify patients regardless of their condition or eligibility for Hospice.　Plaintiff-Relators were given this express direction by Singleton.　This policy resulted in the high percentage admission of non-qualifying patients whose care was and is fraudulently billed to the United States through Medicare and Medicaid.　At this time, Plaintiff-Relators estimate

9

that 90% of the Medicare and Medicaid billings by Serenity/Caring Hands are illegitimate.

16.    Additionally, and even more egregiously, Defendants have implemented a regular practice of back-dating patient admissions.  This practice results in bills to Medicare for hospice care that was never rendered to patients – Defendants falsely bill for work they claim to have performed long before the patient was ever referred to or seen by a Serenity/Caring Hands employee. Plaintiff-Relators are routinely directed by Singleton – and have been personally directed by Badii – to fraudulently alter admission dates in order to elicit false payments from Medicare, Medicaid, or both.  Plaintiff-Relators are aware of numerous instances in which this practice has resulted directly in false claims to the United States.

### b.    Fraudulent "Dumping" of Patients and Backdating Patient Revocation Forms

17.    Defendants illegally shift costs to the United States by fraudulently "dumping" patients who require expensive palliative care.  Under their agreements with CMS and in exchange for their per-patient per diem payment, hospice providers are obligated to bear the costs of all palliative care to eligible hospice patients.  Defendants deliberately evade this obligation by fraudulently "revoking" hospice patients who are in need of expensive – but palliative – drugs or treatments.  Patients are deemed to revoke hospice care only when they expressly

elect aggressive curative – as opposed to palliative – treatment.  When Defendants'
patients require costly palliative care or are admitted to the hospital for costly
palliative treatment, Defendants falsify paperwork indicating that their patients
voluntarily revoked the hospice benefit.  Such paperwork is fraudulently backdated
to indicate a revocation date prior to the hospital stay.  As a result, care that should
be borne by Defendants is paid for by the United States at a much higher fee-per-
service rate under Medicare Part A.

18.     For example, on Sunday, September 6, 2009, Plaintiff-Relator
Shackleford's father – a patient at Caring Hands hospice – was admitted to the
intensive care unit (ICU) with numerous complications.  Medical staff advised the
family that he was unlikely to recover and would very probably expire in the
hospital.  The following Monday, September 7, 2009, Singleton asked Plaintiff-
Relator Shackleford to fraudulently sign and back-date a revocation form stating
that her father voluntarily elected to forfeit his hospice benefit.  Of course, nothing
could be further from the truth.  To the contrary, the very moment Defendants
sought to "dump" Plaintiff-Relator Shackleford's father from their census to avoid
paying his expensive palliative hospital treatment was the moment he and his
family most needed hospice care.  Nonetheless, Singleton repeatedly called and
pressured Plaintiff-Relator Shackleford to sign the revocation and to back-date it to
the Friday before her father was admitted to the ICU.  When Plaintiff-Relator

Shackleford refused, Singleton threatened to fire Shackleford unless she assisted in the scheme to rob her father and her family of the much-needed hospice service to which they were entitled.  Singleton's threats and coercion are ongoing as of the date of this filing.

19.    The purpose of Hospice – and the obligation undertaken by Defendants as Medicare certified hospice-providers – is to provide end-of-life care and ease the burden for patients and their families.  In direct frustration of that purpose, Defendants evade their obligations to patients and families by fraudulently revoking their hospice benefit, often at the very end of patients' lives. In so doing, Defendants violate their agreement with CMS and fraudulently shift costs from themselves to the United States, contravening the express purpose and spirit of hospice care as envisioned by Dr. Kübler Ross and Congress.  The result of Defendants' fraudulent scheme is that the United States pays twice for the same treatment; although it has already paid Defendants a per diem to provide all palliative care to their patients, by reason of Defendants' fraudulent revocations the United States pays again – at a much higher rate – under Medicare Part A for the patients' hospital stays and costly end-of-life care.

c.    **Fraudulent Selection and Modification of Patient Diagnoses**

20.    Defendants perpetrate a deleterious scheme intended to maximize profits and cut costs by recording and submitting to Medicare inaccurate patient

12

diagnoses.  Some diagnoses justifying hospice admission manifestly require more costly care – including drugs and treatments – than others.   Accordingly, if a patient has a condition requiring expensive palliative care – to be borne by Defendants – Defendants instead admit the patient under a diagnosis that allows for a less expensive care regimen. Singleton instructs all Serenity/Caring Hands RNs and billing personnel to select patient diagnoses on the basis of cost of care rather than actual clinical characteristics.  For example, a patient with cancer, which may require expensive palliative treatment, may instead be admitted with a false diagnoses of failure to thrive, which generally requires only custodial, palliative care.  The obvious result is that Defendants' patients do not receive the care they need.  Defendants evade their obligation to the United States to provide end-of-life care to their patients by falsely reporting patient diagnoses.  Defendants thus avoid cost at the expense of their patients and the United States.

21.    In support of their fraud, and to avoid cost, Defendants falsify records intended to conceal the true condition of their patients and their need for treatment. Thus, Defendants inhumanely avoid giving patients any expensive drugs or treatments they may need.   For example, Singleton and others instruct caregivers to falsify their recordings of patient body mass index to avoid expensive dietician visits and nutrition supplements.  Any steep body mass decline outside of certain parameters requires dietician consultation and, inevitably, the prescription of

Ensure or other costly nutrition supplements. Accordingly, Singleton has directly instructed Plaintiff-Relators to avoid recording steep or drastic declines in body mass index and to instead falsely record gradual declines.

22.    Defendants also perpetrate and cover up their fraud by falsifying patient care notes and other documents indicating care that was never provided. For example, the caregiver assigned to visit Ms. Shackelford's father failed to provide any care and repeatedly neglected to make scheduled visits. Without seeing the patient she manufactured patient records to falsely indicate visits and treatments that were never performed. Instead of visiting her patient, she simply fabricated records indicating that Ms. Shackelford's father was having regular bowel movements, when in fact his bowel was becoming impacted and was in danger of rupturing. Ms. Shackleford discovered the situation in time to have her father rushed to the hospital.

23.    Plaintiffs-Relators are aware of countless instances in which patient care notes and charts have been falsified to reflect care that was never provided – either to justify a fraudulently backdated admission or simply to avoid the expense of actually providing care. In late 2007, while Defendants were working to achieve State and Medicare certification for Serenity, Defendants became aware that State auditors were preparing to visit the Serenity offices. Badii and several others flew into Birmingham and orchestrated an all-night document forgery

session.  Thousands of documents were fabricated, wholesale, including physician signatures, patient consent forms, and certifications of all kinds.

### d.    Fraudulent Shifting of Patients Between Defendants' Hospices

24.    Defendants conjointly operate Caring Hands, a not-for-profit hospice, and Serenity, a for-profit-hospice.    Upon information and belief, Serenity's Birmingham, Alabama location does not yet have a Medicare provider number, and thus cannot directly bill Medicare.  Accordingly, Defendants recruit patients onto Serenity's roles and fraudulently transfer them to Caring Hands without the patients' consent, by completely fabricating patient consent and admission paperwork after the fact.  Plaintiff-Relators have been consistently instructed by Singleton and Badii, after admitting patients to Serenity, to falsify complete admission paperwork creating the appearance that such patients were admitted to Caring Hands.  These patients are never informed of a change in their care-giver and never give consent.

25.    All of Defendants' schemes result in fraudulent payments by the United States.  Defendants' practices not only inflate the cost of end-of-life care and jeopardize the over-burdened Medicare system, but also grossly endanger patients and undermine the purpose, mission, and spirit of hospice care.

## COUNT ONE
### 31 U.S.C. § 3729(a)(1) and 3729(a)(2)
### FALSE CLAIMS FOR NON-QUALIFYING HOSPICE PATIENTS

26.     Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

27.     By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information –  presented or caused to be presented false or fraudulent claims to the United States for payment or approval and knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

(a)     false certifications and/or re-certifications of Hospice patients whom Defendants knew did not qualify for Medicare or Medicaid reimbursement and false claims to the United States for hospices services to such patients;

(b)     false "back-dated" admissions and false claims to the United States for hospices services Defendants never performed;

(c)     false patient records reflecting Defendants' provision of hospice services that Defendants never, in fact, performed;

(d)     false patient records, medical charts, and physician orders indicating fraudulent diagnoses unrelated to patients' actual clinical characteristics intended to evade Defendants' obligations under CMS contracts;

(e)     false documents reflecting admission of patients to Caring Hands when patients were in fact admitted to Serenity;

28.     The United States paid the false claims described herein and summarized in paragraph 27(a)-(e).

29.     By and through the actions described *supra*, Defendants knowingly made, used, or caused to be made or used, false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid.

30.     Defendants fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendants by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States and themselves and against Defendants in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, further, or different relief to which Plaintiff-Relators may be entitled.

**COUNT TWO**
**CAUSING FALSE CLAIMS TO BE PRESENTED FOR**
**MEDICARE PAYMENT and REVERSE FALSE CLAIMS**
**UNDER 31 U.S.C. § 3729**

32.     Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

33.     Defendants knowingly caused false or fraudulent claims to be presented to the United States for payment or approval and knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit: by fraudulently eliciting and backdating revocations in order to avoid providing palliative care and to instead have costs paid on a fee-per-service basis by Medicare or Medicaid, Defendants caused to be presented false claims to the United States in the form of the claims for payment for such service through Medicare or Medicaid, which should have been borne by Defendants and not by the United States.

34.     Defendants' fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through fraudulent revocation of

18

hospice patients in order to avoid paying for palliative treatment, which resulted in fraudulent billing of the United States at a much higher rate through Medicare or Medicaid.

35.    By and through the actions described *supra*, Defendants knowingly made, used, or caused to be made or used, false revocation documents and back-dated revocations regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid to get a false or fraudulent claim paid or approved by the United States.

36.    Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid by the United States through Medicare and Medicaid for such false or fraudulent claims for payment of services which should have been paid for by Defendants.

WHEREFORE, Plaintiff-Relators request entry of judgment in favor the United States and themselves, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

**COUNT THREE**
**31 U.S.C. § 3729(a)(3)**
**CONSPIRACY**

37.     Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

38.     As described *supra*, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval and knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States.

39.     The United States paid Defendants for such false claims.

40.     Defendants, in concert with their principals, agents, employees, subsidiaries, and other institutions did conspire and agree to submit such false claims to the United States.

41.     Defendants and their principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States by submitting false claims for payment to the United States through Medicare or Medicaid.

42.     Defendants' fraudulent actions, together with the fraudulent actions of its principals, agents and employees, have resulted in damage to the United States

equal to the amount paid by the United States to Defendants and others as a result of Defendants' fraudulent claims.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

**COUNT FOUR**
**SUPPRESSION, FRAUD, AND DECEIT**

43.     Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

44.     Defendants misrepresented to the United States or suppressed the material facts that:

(a)     a substantial number of their patients enrolled in Hospice do not qualify for Hospice and are not terminally ill;

(b)     Defendants illegally recorded and reported false admission dates for hospice patients;

(c)     Defendants falsified documents indicating patient admission diagnoses;

(d)     Defendants falsified documents indicating admission of patients to Caring Hands who were in fact admitted to Serenity;

(e)     Defendants did not, in fact, perform much of the service for which they billed the United States.

(f)     Defendants illegally "revoked" and backdated revocation documents to avoid their obligation to the United States to provide palliative care to qualified patients.

45.     Defendants were legally obligated to communicate these facts to the United States.

46.     Such misrepresentations were made willfully to deceive or recklessly without knowledge.

47.     The United States acted on Defendants' material misrepresentations described herein to its detriment.

48.     Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid by the United States to Defendants and others as a result of Defendants' fraudulent claims.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States and against Defendants pursuant to 31 U.S.C. § 3732 and ALA. CODE §§ 6-5-101, 6-5-102, and 6-5-103 in an amount sufficient to compensate the United States for Defendants' fraud, suppression, and deceit, together with punitive damages in an amount calculated to deter Defendants from engaging in such

conduct in the future, along with attorneys' fees, costs, interest, and any other, further, or different relief to which Plaintiff-Relators may be entitled.

Date:  September 24, 2009.

_____

HENRY I FROHSIN
JAMES F. BARGER, JR.
J. ELLIOTT WALTHALL

Attorneys for Plaintiff-Relators
Glenda Shackleford, Marilyn Payne
And Belinda Borden

**OF COUNSEL:**

FROHSIN & BARGER, LLC
One Highland Place, Suite 310
2151 Highland Avenue
Birmingham, Alabama 35205
Tel:  205.933.4006
Fax:  205.933.4008

**RELATOR DEMANDS A TRIAL BY STRUCK JURY**

# CERTIFICATE OF SERVICE

On this the 24th day of September, 2009, Plaintiff-Relators hereby certify that in compliance with Rule 4 of the *Federal Rules of Civil Procedure*, service of the *Qui Tam* Complaint has been executed as follows:

**By Hand-Delivery to:**
United States Attorney, Joyce W. Vance
Attn:  AUSA Lloyd C. Peebles
1801 Fourth Avenue North
Birmingham, AL 35203

**By Certified Mail to:**
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

_____
OF COUNSEL